FILED
2020 Jun-10  PM 03:34
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

| | | |
|---|---|---|
| LYNDAIN WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 7:19-cv-00265-LSC |
| | ) | |
| MERCEDES BENZ US | ) | |
| INTERNATIONAL, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## MEMORANDUM OF OPINION

Plaintiff Lyndain Williams ("Plaintiff" or "Williams") brings suit against his former employer Mercedes-Benz U.S. International, Inc. ("Defendant" or "MBUSI"), alleging racial discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*, and 42 U.S.C. § 1981. Before the Court is Defendant's motion for summary judgment. (Doc. 12.) The motion has been briefed and is ripe for review. For the reasons stated below, Defendant's motion for summary judgment is due to be granted.

## I.    BACKGROUND[1]

Plaintiff is a black male who formerly worked for Defendant as a Team Member in its Assembly Plant 2, Trim 5 Line, B-Shift. (Def's Ex. A at 34–35, 160.)[2] During his employment with Defendant, Plaintiff worked under the supervision of various Team Leaders. At the time of his termination, Plaintiff's Team Leader was James Solomon, a black male. (*Id.* at 47.) Prior to working under Solomon's supervision, Plaintiff worked under the supervision of Team Leader James Sadberry, a white male. (*Id.*)

Defendant utilizes a system of progressive discipline referred to as its Corrective Performance Review ("CPR") policy. (Def's Ex. C at ¶ 4.) Under this progressive disciplinary policy, a Team Member could progress through several penalties including a Level I CPR, a Level II CPR, a Level III CPR, and finally a

---

[1]    The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the Court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994). The Court is not required to identify unreferenced evidence supporting a party's position. As such, review is limited to exhibits and specific portions of the exhibits specifically cited by the parties. *See Chavez v. Sec'y, Fla. Dept. of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) ("[D]istrict court judges are not required to ferret out delectable facts buried in a massive record . . . ." (internal quotations omitted)).

[2]    Plaintiff's response fails to controvert any material facts set forth in Defendant's Statement of Facts. (*See* doc. 17.) Under this Court's Uniform Initial Order, all such facts are therefore deemed admitted. (Doc. 5 at 16–17 ("*All material facts set forth in the statement required of the moving party will be deemed to be admitted for summary judgment purposes unless controverted by the response of the party opposing summary judgment.*").)

Termination CPR. (*Id.* at ¶ 5.)

### A. PLAINTIFF'S LEVEL I CPR FOR IMPROPER CELL PHONE USAGE[3]

In the summer of 2016, Defendant began to place new emphasis on its policy of not permitting workers to use cell phones while on the production line ("the Line"). (Def's Ex. A at 54–55.) The policy made exemptions for Team Leaders, who might need to use their cell phones to document or report quality defects that occurred on the Line. (*Id.*) Plaintiff received training on this new cell phone policy and understood that non-Team Leaders should not use their cell phones while on the Line. (*Id.* at 55, 57.)

On November 18, 2016, Plaintiff received a Level I CPR for using his cell phone to text while the Line was running. (Def's Ex. B – DX 5.) James Sadberry, Plaintiff's Team Leader at the time claims to have observed Plaintiff leaning against a rack and texting while the Line was running, prompting him to issue the Level I CPR. (Def's Ex. D at ¶¶ 4–5.) Team Relations Manager Zina Cooper, a black female, authorized the CPR on this occasion. (Def's Ex. C at ¶¶ 1, 6.)

Plaintiff disputes that he made improper use of his cell phone on this occasion. Specifically, he claims that (1) he was not texting on the Line, and (2) even if he was

---

[3]    Plaintiff previously received a Level II CPR in November 2015 for engaging in a physical altercation with Jimmie Jones, a black male Team Member. (Def's Ex. A at 43, 49–50, 52.) However, that CPR expired on October 30, 2016, and it does not appear to have contributed towards the termination of Plaintiff's employment. (*See* Def's Ex. B – DX 2.)

using his cell phone, he had a right to do so because he was acting as a Team Leader on that date. (Def's Ex. A at 63.) However, Plaintiff did not dispute his cell phone usage or claim to be acting as a Team Leader in the space of his CPR that is reserved for Team Member comments. (Def's Ex. B – DX 5.) Instead, he wrote a comment alleging that Sadberry should not have issued the CPR because Sadberry allowed other Team Members to use their cell phones on the Line. (*Id.*) Moreover, Sadberry himself denies that Plaintiff had stepped up to cover for a Team Leader on that date. (Def's Ex. D at ¶ 6.)

In addition to the Level I CPR issued to Plaintiff, James Sadberry has issued CPRs to other Team Members, black and white, for using their cell phones in violation of Defendant's policy. (*Id.* at ¶ 7.) Plaintiff has admitted to having no knowledge of why Sadberry would have falsely accused Plaintiff on this occasion, and he admits that he got along well with Sadberry. (Def's Ex A at 52, 62.) He does recall hearing David Foreman mention in December 2014 or 2015 that Sadberry is a racist. (*Id.* at 152–53.) However, Foreman denies ever making such a comment about Sadberry. (Def's Ex. F at ¶ 4.)

During the time that Sadberry acted as Plaintiff's Team Leader, Plaintiff witnessed David Jones, a white Team Member, using his cell phone multiple times while working on the Line. (*Id.* at 79–80.) Jones faced no discipline for his cell phone

use. (*Id.*) However, it is not clear whether Jones used his cell phone before or after Defendant began placing greater emphasis on its cell phone policy. (*Id.* at 80.)[4] Moreover, Plaintiff is unaware of whether Sadberry ever witnessed Jones making improper use of his cell phone. (*Id.* at 80–81.) Sadberry himself denies ever having witnessed Jones on his cell phone while on the Line. (Def's Ex. D at ¶ 8.) Ted Solomon, the Team Leader who succeeded Sadberry, also denies having ever witnessed Jones violating the cell phone policy. (Def's Ex. E at ¶ 7.)

In March 2017, Plaintiff also witnessed Charles Owens, another white Team Member, using his cell phone during a start-up meeting. (Def's Ex. A at 81.) Ted Solomon, the Group Leader at the time, witnessed Owens's cell phone use. (*Id.* at 82.) When Solomon looked at Owens, the latter immediately put away his cell phone. (*Id.* at 83.) Solomon did not discipline Owens on this occasion because (1) the Line was not running, (2) the start-up meeting had only just begun, and (3) Owens immediately put away his cell phone when Solomon noticed him. (Def's Ex. E at ¶¶ 8–9.) Plaintiff does not recall seeing Owens using his cell phone on the Line when a Team Leader was present. (Def's Ex. A at 84–85.)

---

[4]     Plaintiff's response specifies that David Jones improperly used his cell phone while working on the Line in February 2017, after Defendant began to place greater emphasis on its cell phone policies. (Doc. 17.) However, the portion of the record to which Plaintiff cites does not support that assertion. (*See* Def's Ex. A at 61.) On the contrary, the record indicates that Plaintiff is unaware of when David Jones allegedly used his cell phone while working on the Line. (*Id.* at 80–81.)

That same month, Plaintiff also witnessed Adam Lewis, another white Team Member, using his cell phone during a start-up meeting. (*Id.* at 85–86.) Like Charles Owens, Lewis put away his phone upon catching the attention of Ted Solomon. (*Id.* at 86.) Solomon chose not to discipline Lewis because (1) Lewis was new to B-Shift and therefore unfamiliar with how those on B-Shift conducted themselves, and (2) Lewis's wife was pregnant and suffering from complications at the time. (Def's Ex. E at ¶ 12.) Instead, Solomon spoke with Lewis after the meeting and explained to him that he could not have his cell phone out at the beginning of the start-up meeting. (*Id.*) When Plaintiff later spoke with Solomon about Lewis's cell phone use, Solomon responded that Lewis had put away his phone. (Def's Ex. A at 89–90.)

## B.  TED SOLOMON'S INSPECTIONS OF BLACK TEAM MEMBERS

In December 2016, Team Leader Ted Solomon began conducting checks of whether certain black Team Members, including Plaintiff himself, signed in at their stations. (Def's Ex. A at 138–40.) Though he checked the sign-in sheets for several black employees, he did not check the sign-in sheet for Charles Owens, a white employee. (*Id.* at 139.) Plaintiff brought this discrepancy to Solomon's attention, but Solomon offered no explanation. (*Id.* at 140.) However, although Plaintiff claims that Solomon did not inspect the sign-in sheets with respect to Charles Owens, it is undisputed that Solomon periodically checks the sign-in sheets to make sure that

various employees, whether white or black, sign in and out of their stations. (Def's Ex. E at ¶ 15.)

## C. Plaintiff's Level II CPR for Improper Absence from the Manufacturing Line

In February 2017, Plaintiff received a Level II CPR for unauthorized time away and use of a cell phone during working hours. (Def's Ex. C at ¶ 7.) As with the prior Level I CPR, Team Relations Manager Zina Cooper made the decision to issue the Level II CPR. (Def's Ex. C at ¶ 8.) Solomon, as Plaintiff's Team Leader at the time, approved the decision. (Def's Ex. E at ¶ 6.) David Foreman, a black male Team Relations Representative, also was among those who approved the decision. (Def's Ex. C at ¶ 8.)

Plaintiff had requested and received permission to go to the restroom while the Line was operating. (Def's Ex. A at 65.) Because the restroom near the Line was full, Plaintiff instead went to the restroom by the Atrium area. (*Id.* at 65–66.) After using the Atrium restroom, Plaintiff sat down at a table in the Atrium and began writing down notes while the Line was still running. (*Id.* at 71–72.)

Ted Solomon, Plaintiff's Team Leader at the time, heard reports from Team Leader James Dial and another employee named Randy Fondren that they had observed Plaintiff in the Atrium, using his cell phone during working hours. (Def's Ex. E at ¶ 5.) Plaintiff admits that he lacked permission to sit in the Atrium and write

notes while the Line was running. (Def's Ex. A at 76.) He denies only that he was using his cell phone, despite James Dial's claim of witnessing Plaintiff making such use. (*Id.* at 71.) Though he now denies some of the allegations against him, Plaintiff wrote no comment on his Level II CPR disputing the fact that he had used his cell phone. (Def's Ex. B – DX 6.)

Plaintiff is not aware of anyone else who ever asked to go to the restroom while the Line was running and then went to the Atrium and sat at a table writing notes. (Def's Ex. A at 77.) However, he is aware of a white Team Member named Larry Roland who left the Line early yet faced no discipline. (*Id.* at 143–44.) Ted Solomon did not discipline Roland because he believed that Roland had made an honest mistake in thinking that it was break time. (Def's Ex. E at ¶ 17.)

On March 28, 2017, after Plaintiff had already received his Level II CPR, he met with David Foreman to discuss what he viewed to be disparate treatment by his supervisors. (Def's Ex. F at ¶ 2.) He told Foreman that he did not think that it was fair that he faced discipline for using his cell phone while other white employees using their cell phones received no discipline. (Def's Ex. A at 78–79.) Foreman advised Plaintiff to worry about himself and to make sure that he did not use his cell phone in violation of Defendant's policies. (*Id.* at 78.) Following the meeting, Foreman did not communicate this discussion with anyone else. (Def's Ex. F at ¶ 2.)

Nor did he participate in any future proceedings regarding Plaintiff's disciplinary issues. (*See* Def's Ex. C at 25.)

### E.  PLAINTIFF'S LEVEL III CPR FOR ATTENDANCE VIOLATIONS

In April 2017, Plaintiff received a Level III CPR for attendance violations. (Def's Ex. B – DX 7.) Defendant has an occurrence-based attendance policy. (Def's Ex. C at ¶ 3.) Plaintiff received one occurrence for being not more than two hours late yet failing to call in within the 30-minute window before his shift on December 2, 2016. (Def's Ex. B – DX 7.) This attendance violation arose because Plaintiff was pulled over by the police on that occasion. (Def's Ex. A at 93.) Plaintiff also received two occurrences because he was more than four hours late and did not call in within the thirty-minute window before his shift began on April 5, 2017. (Def's Ex. B – DX 7.) Plaintiff claims that this attendance violation arose from a situation at home. (Def's Ex. A at 93.) Because Plaintiff received three occurrences within 180 days, Defendant's attendance policy warranted that Plaintiff receive a CPR. (Def's Ex. C at ¶ 9.)

Team Relations Manager Zina Cooper made the decision to issue a Level III CPR to Plaintiff. (Def's Ex. C at ¶ 11.) As described above, Plaintiff had an existing Level II CPR based on his improper absence while the Line was running. Defendant's progressive disciplinary policy therefore mandated that Plaintiff receive

a Level III CPR based on the existence of that prior Level II CPR. (*Id.* at ¶ 12.) However, Plaintiff interpreted Defendant's progressive disciplinary policy to require that he receive a Level I CPR because his violation arose from attendance issues, unlike his prior violations of the cell phone policy. (Def's Ex. A at 128–31.) It is unclear what led Plaintiff to interpret the policy in such a way.

Later, on May 15, 2017, Plaintiff filed an EEOC Charge of Discrimination, alleging race discrimination and retaliation. (Def's Ex. B – DX 16.) He is not aware of whether any relevant decisionmakers knew that he had filed this EEOC Charge. (*Id.* at 107–08.) Furthermore, several relevant decisionmakers in this case, including David Olive, James Sadberry, and Ted Solomon, have all affirmatively denied having had any knowledge of Plaintiff's EEOC Charge at the times in which they participated in Plaintiff's disciplinary proceedings. (Def's Ex. C at ¶¶ 22–23; Def's Ex. D at ¶ 11; Def's Ex. E at ¶ 14.)

### F. Plaintiff's Termination CPR for Failing to Follow Production Procedures

On May 18, 2017, several supervisors and employees witnessed Plaintiff failing to perform the process of "rolling the sill plate" while the Line was running. (Def's Ex. D at ¶ 10; Def's Ex. E at ¶ 13.) Defendant has standard methods and procedures for the processes that must be followed by Team Members. (*Id.* at 104.) One such standard procedure involves "rolling the sill plate." (*Id.* at 101–02, 105.) The "sill

plate" is a piece of plastic with adhesive that goes in the bottom of a car door where the door shuts. (*Id.* at 102.) Under this process, Plaintiff was required to "roll [the sill plate] with a little roller." (*Id.* at 102–03.) Plaintiff admitted that he did not roll the sill plate on May 18, 2017. (Def's Ex. A at 103.)

Plaintiff kept his roller on the "limo," a box that rides along with a vehicle on the Line and carries tools necessary for Team Members to work on the vehicles. (*Id.* at 117–18, 121–22.) To allow movement up and down the Line, the limo has a foot mechanism. (*Id.* at 117.) However, the limo used by Plaintiff suffered from technical issues: its foot pedal often became stuck and caused the limo to ride down the Line and away from Plaintiff's station. (*Id.*) Every Team Member who worked at Plaintiff's station on the Line had similar issues with this limo. (*Id.* at 122.) Plaintiff reported this issue to his supervisors several months or even a year before the incident on May 18, 2017. (*Id.* at 165–66.) Prior to that incident, he had, on ten or fifteen separate occasions, reacted to problems with the limo by pulling a cord to get the attention of a Team Leader. (*Id.* at 166–67.) He had also attempted to mitigate the problems on his own by keeping the roller in his pocket rather than placing it in the limo. (*Id.* 163–64.) However, Ted Solomon prohibited him from keeping the roller in his pocket, reasoning that it could damage a vehicle if kept there while Plaintiff was working. (*Id.* at 164.)

On May 21, 2017, after he was seen failing to roll the sill plate, Plaintiff called an employee Hot Line regarding potential discrimination. (Def's Ex. A at 136–37.) He did not reach anyone when using the Hot Line number, so he sent a follow-up email regarding his concerns the next day. (*Id.*) He is not aware of whether any relevant decisionmakers knew of his Hot Line call. (*Id.* at 108.) Furthermore, several relevant decisionmakers, including David Olive, James Sadberry, and Ted Solomon, have each affirmatively denied knowing of the Hot Line call. (Def's Ex. C. at ¶¶ 22–23; Def's Ex. D at ¶ 11; Def's Ex. E at ¶ 14.) Finally, Plaintiff filed a second EEOC Charge of Discrimination on June 2, 2017, alleging only retaliation. (Def's Ex. B – DX 17.)

During this same period, William Harden, a black male Team Relations Representative, investigated Plaintiff's May 18 violation and supplied his findings to Team Relations Manager Zina Cooper. (Def's Ex. C at ¶¶ 11, 14.) Cooper then recommended Plaintiff's termination based on his existing Level III CPR. (*Id.* at ¶¶ 15, 17.) David Olive, Defendant's HR Senior Manager, approved Cooper's recommendation that Plaintiff be terminated. (*Id.* at ¶ 16.) As a result, on June 2, 2017, Defendant issued a Termination CPR to Plaintiff. (*Id.* at ¶¶ 17–18; Def's Ex. B – DX 11.)

Plaintiff learned of his termination via a letter dated June 2, 2017. (Def's Ex.

B – DX 11.) He requested peer review regarding his termination. (Def's Ex. A at 37–38.) A panel reviewed Plaintiff's termination on July 27, 2017, upholding his termination. (Def's Ex. B – DX 13.) Because his termination arose from misconduct, Plaintiff did not receive unemployment compensation. (*Id.* – DX 14.)

In a separate incident, Logan Wright, a white Team Member, also failed to roll the sill plate, and he received a CPR for his misconduct. (Def's Ex. C at ¶¶ 19–20.) Unlike Plaintiff, however, Wright had not previously received a CPR. (*Id.* at ¶ 21.) Therefore, Wright received only a Level II CPR, as opposed to the Termination CPR that Plaintiff received. (*Id.*)

## II.    STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is genuine if "the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004). A genuine dispute as to a material fact exists "if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (quoting *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001)). The trial judge

should not weigh the evidence, but should determine whether there are any genuine issues of fact that should be resolved at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

In considering a motion for summary judgment, trial courts must give deference to the non-moving party by "view[ing] the materials presented and all factual inferences in the light most favorable to the nonmoving party." *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1213–14 (11th Cir. 2015) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). However, "unsubstantiated assertions alone are not enough to withstand a motion for summary judgment." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1987). Conclusory allegations and "mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment." *Melton v. Abston*, 841 F.3d 1207, 1219 (11th Cir. 2016) (per curiam) (quoting *Young v. City of Palm Bay, Fla.*, 358 F.3d 859, 860 (11th Cir. 2004)).  In making a motion for summary judgment, "the moving party has the burden of either negating an essential element of the nonmoving party's case or showing that there is no evidence to prove a fact necessary to the nonmoving party's case." *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013). Although the trial courts must use caution when granting motions for summary judgment, "[s]ummary judgment procedure is properly

regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

## III.   DISCUSSION

### A. RETALIATION

Plaintiff brings a claim for retaliation under Title VII and § 1981.[5] Absent direct evidence of retaliatory motive, the Court analyzes this claim using the burden-shifting *McDonnell Douglas* framework. *Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1202 (11th Cir. 2013) (citing *McDonnell Douglas v. Green*, 411 U.S. 792 (1973)).[6] "First, the plaintiff must establish a prima facie case, which raises a presumption that the employer's decision was more likely than not based upon an impermissible factor." *Richardson v. Leeds Police Dep't*, 71 F.3d 801, 805 (11th Cir. 1995). If the plaintiff meets this burden, the defendant has the opportunity to articulate a legitimate non-retaliatory justification for its actions, which the plaintiff can then rebut with evidence of pretext. *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1181–82 (11th Cir. 2010).

---

[5]    Title VII and § 1981 "have the same requirements of proof and use the same analytical framework." *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998). Accordingly, this Court's analysis of Plaintiff's retaliation and race discrimination claims is equally applicable under either Title VII or § 1981.

[6]    "Direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption." *Standard*, 161 F.3d at 1330.

To establish a prima facie case for retaliation, Plaintiff must show that (1) he engaged in a protected activity, (2) he suffered an adverse employment action, and (3) there was a causal connection between his protected activity and his injury. *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008). There is no dispute regarding the first two elements of Plaintiff's prima facie case.

Plaintiff has shown that he engaged in a protected activity. "Title VII protects not just 'individuals who have filed formal complaints,' but also those 'who informally voice complaints to their superiors or who use their employers' internal grievance procedures.'" *Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 715 n.2 (11th Cir. 2002) (quoting *Rollins v. Fla. Dep't of Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989) (per curiam)).   The record indicates that Plaintiff engaged in numerous protected activities, such as complaining to a supervisor, David Foreman, of disparate treatment based on his race, filing two separate EEOC Charges of Discrimination and Retaliation, and making a Hot Line call regarding the same disparate treatment and retaliation.

Plaintiff has also satisfied the requirement that he suffered from an adverse employment action. For a retaliatory act to qualify as an adverse employment action, it must be materially adverse such that it might have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry.*

*Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). Following his protected activities, Plaintiff alleges that he faced disproportionately harsh forms of discipline. Specifically, Plaintiff alleges that (1) he received a Level III CPR for attendance violations when only a Level I CPR was appropriate, and (2) Defendant terminated his employment following his failure to roll the sill plate. A reasonable worker faced with disproportionately harsh forms of discipline in response to his protected activity may be dissuaded from engaging in further protected activities. Therefore, Plaintiff has satisfied the first two elements of his prima facie case.

Nonetheless, Plaintiff has failed to show a causal connection between his protected activities and the adverse employment actions that he faced. To show a causal connection, Plaintiff must present "proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). "A decision maker cannot have been motivated to retaliate by something unknown to him." *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000). Thus, Plaintiff "must, at a minimum, generally establish that the defendant was actually aware of the protected expression at the time the defendant took the adverse employment action." *Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1197 (11th

Cir. 1997). However, Plaintiff has failed to demonstrate that any decisionmaker was ever aware of his protected activities prior to the adverse employment actions that he claims occurred. Plaintiff's meeting with David Foreman regarding disparate treatment he faced occurred on March 28, 2017, after Foreman participated in the decision to issue Plaintiff a Level II CPR. Plaintiff has not shown that Foreman participated in any further disciplinary actions taken against him, and Foreman himself denies that he communicated the pair's discussion with anyone else. Furthermore, Plaintiff admits that he lacks any knowledge of whether other decisionmakers ever learned of his EEOC Charges of Discrimination or his Hot Line call. Indeed, decisionmakers, such as James Sadberry, Ted Solomon, and David Olive, have affirmatively denied having any knowledge of Plaintiff's protected activities during the time in which Plaintiff faced discipline. Plaintiff thus has demonstrated no causal connection between his protected activities and any adverse employment action, and he has therefore failed to establish a prima facie case of retaliation.

Furthermore, even if Plaintiff could establish a prima facie case of retaliation, he has not provided enough evidence to rebut Defendant's non-retaliatory justifications for its actions. As an initial matter, Plaintiff has produced no evidence to support his belief that his attendance violations warranted only a Level I CPR

under Defendant's progressive disciplinary policy. Furthermore, Defendant maintains that Plaintiff received a Termination CPR because he failed to follow the required procedure for rolling sill plates and had a prior Level III CPR, thus necessitating progression to a Termination CPR. Against this justification, Plaintiff argues that (1) termination for failure to roll the sill plate was inappropriate due to the ongoing issues with the "limo" device, and (2) the EEOC's findings of evidence to support a claim of retaliation make summary judgment inappropriate in this case.[7] However, neither of Plaintiff's arguments warrant denial of summary judgment.

First, the fact that the limo was non-functional does not excuse the undisputed fact that Plaintiff violated Defendant's requirement that he roll the sill plate. "A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer." *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc). Plaintiff argues that Defendant "failed, repeatedly, over an extended period of time, [to provide] the tools and/or equipment necessary to accomplish the proper sill applications." (Doc. 17.) However, the record does not indicate that Plaintiff lacked the roller necessary to roll the sill as required. Instead, Plaintiff has shown only that the mechanism on

---

[7] The EEOC's letter of determination specifically provides that "it was determined that the evidence obtained during the investigation established that there is reasonable cause to conclude that the Charging Party was discriminated against on the basis of race, Black and retaliation, in violation of Title VII." (Pl's Ex. 2 at 2.)

which the roller was required to be kept often malfunctioned and moved away from Plaintiff's workstation. It is undisputed that, on several occasions prior to May 18, 2017, Plaintiff resolved issues with the limo by alerting his supervisors when it malfunctioned. Plaintiff has not produced any evidence explaining why he could not alert his supervisors on May 18, 2017, in the same manner that he had alerted them on numerous prior occasions. Thus, the record indicates that the malfunctioning limo only made the required procedure of rolling the sill plate inconvenient, rather than impossible. Under these circumstances, the Court will not question the business judgment of Defendant in terminating Plaintiff's employment for failure to perform a required—albeit inconvenient—task.

Second, even the EEOC's finding of evidence to support a claim for retaliation does not warrant a different outcome in this case. To be sure, a district court may rely upon an EEOC finding of reasonable cause to bolster its own finding that a genuine dispute of fact exists for a claim of retaliation. *See Horne v. Turner Constr. Co.*, 136 F. App'x 289, 292 (11th Cir. 2005) (per curiam) (noting that EEOC's findings bolstered other direct and circumstantial evidence of discrimination produced by plaintiff). However, Plaintiff has not cited any authority indicating that EEOC findings in his favor, without more, are sufficient to create a genuine dispute of material fact. Moreover, as a general matter, "EEOC findings are not binding with

regard to subsequent discrimination suits in federal court." *Danielle-DiSerafino v. Dist. Sch. Bd. of Collier Cty, Fla.*, 756 F. App'x 940, 944 (11th Cir. 2018) (per curiam). "The probative value of EEOC findings is left to the district court's discretion." *Id.* (citing *Barfield v. Orange Cty.*, 911 F.2d 644, 649–51 (11th Cir. 1990)). Upon comparison of the EEOC's findings with the remainder of the record, the Court finds that the EEOC's findings are too incomplete to hold probative weight. For example, in support of its conclusion that a reasonable basis for a finding of retaliation exists, the EEOC's letter notes that "on observation, the employees after [Plaintiff's] dismissal were not adhering to the [sill rolling] process and no action was taken." (Pl's Ex. 2 at 2.) However, it is undisputed by the parties that Logan Wright, a white Team Member, faced disciplinary action after he, like Plaintiff, failed to roll the sill plate as required under Defendant's policies. The EEOC's findings are thus inconsistent with other undisputed evidence in the record, and they carry little probative weight in this proceeding.

Plaintiff has thus failed to raise a genuine dispute of material fact regarding his retaliation claim. Accordingly, summary judgment is due to be granted for Defendant as to this claim.

## B. RACE DISCRIMINATION

Plaintiff also brings a claim of race discrimination under Title VII and § 1981,

alleging that Defendant treated white employees more favorably than himself. "A plaintiff may prove a claim of intentional discrimination through direct evidence, circumstantial evidence, or through statistical proof." *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 (11th Cir. 2008). Absent direct evidence or statistical proof of discrimination, the Court analyzes a disparate treatment claim under the *McDonnell Douglas* framework. *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 (11th Cir. 1998). However, a "plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the [defendant's] discriminatory intent." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).

Because Plaintiff relies only on circumstantial evidence of discrimination, the Court considers his claim under the *McDonnell Douglas* framework. *See Carter*, 132, F.3d 635 at 642. Under that framework, a plaintiff has the initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802. To establish a prima facie case, a plaintiff must show "(1) that she belongs to a protected class, (2) that she was subjected to an adverse employment action, (3) that she was qualified to perform the job in question, and (4) that her employer treated 'similarly situated' employees outside her class more favorably." *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1220–21 (11th Cir. 2019) (en banc). Once a plaintiff

has established a prima facie case, the burden then shifts "to the [defendant] to articulate some legitimate, nondiscriminatory reason" for its actions. *McDonnell Douglas*, 411 U.S. at 802. Finally, if the defendant articulates a non-discriminatory reason, then the plaintiff is afforded an opportunity to show that the stated reason was a pretext for discrimination. *Id.* at 804.

Plaintiff's race discrimination claim rests on two basic types of disparate treatment that he allegedly experienced. First, Plaintiff argues that Team Leader Ted Solomon deliberately inspected the sign-in sheets of certain black Team Members, including Plaintiff, while choosing not to inspect the sign-in sheet of Charles Owens, a white Team Member. Second, and much more broadly, Plaintiff argues that Defendant took several disciplinary actions against him that it did not take against similarly situated white employees.

Regarding the inspections that Ted Solomon conducted of black employees' sign-in sheets, Plaintiff has not established a prima facie case of race discrimination. Specifically, Plaintiff cannot show that these inspections, even if done with discriminatory bias, constituted an adverse employment action. To qualify as an adverse employment action in the context of discrimination, "the employer's action must impact the 'terms, conditions, or privileges' of the plaintiff's job in a real and demonstrable way." *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir.

2001) (quoting 42 U.S.C. § 2000e-2(a)). The impact must be "serious and material," such that, under the circumstances presented, a reasonable person could find that it was materially adverse. *See id.* Here, even if Solomon conducted the alleged inspections with discriminatory bias, Plaintiff has produced no evidence—and indeed does not even claim—that these inspections led to any material impact on his employment. Accordingly, Plaintiff has failed to establish a prima facie case of race discrimination with respect to the inspections that he faced.

Regarding the discipline that Plaintiff received, the Court need not devote much discussion to several elements of Plaintiff's prima facie case because there is no dispute regarding those elements. For example, the parties do not dispute that Plaintiff, as a black male, is a member of a protected class. Nor do they dispute that he was qualified for his position or that the forms of discipline he received, including termination, constituted adverse employment actions.

The only area of dispute regarding Plaintiff's prima facie case concerns whether Plaintiff has identified "similarly situated" employees outside his class who received more favorable treatment. For this element to be satisfied, Plaintiff and his comparators must be "similarly situated in all material respects." *Lewis*, 918 F.3d at 1226. Ordinarily, a similarly situated comparator: (1) "will have engaged in the same basic conduct (or misconduct) as the plaintiff;" (2) "will have been subject to the

same employment policy, guideline, or rule as the plaintiff;" (3) "will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff;" and (4) "will share the plaintiff's employment or disciplinary history." *Id.* at 1227–28 (cleaned up).

In his deposition testimony, Plaintiff identifies numerous white co-workers who committed the same acts for which he faced discipline and ultimately termination of his employment. First, he identifies David Jones, Charles Owens, and Adam Lewis as white Team Members who violated Defendant's cell phone policies without facing discipline. Second, he identifies Larry Roland as a white Team Member who faced no punishment for his unauthorized absence from the Line. Finally, the record indicates that Logan Wright, another white Team Member who failed to roll the sill plate per Defendant's policy, was not terminated for his violation and instead received a Level II CPR. However, none of the comparators identified by Plaintiff are "similarly situated in all material respects." *Lewis*, 918 F.3d at 1226.

Plaintiff claims to have witnessed David Jones using his cell phone while he was working on the Line. However, he has not shown that Jones did so after Defendant began placing greater emphasis on its policy restricting cell phone use. Thus, Plaintiff has not shown that he and Jones were "subject to the same employment policy, guideline, or rule." *Lewis*, 918 F.3d at 1227. Moreover, Plaintiff

has no knowledge of whether any of their shared supervisors ever witnessed Jones's improper cell phone use. Indeed, several supervisors have affirmatively denied ever having seen Jones violating the cell phone policy while on the Line. A comparator's actions have no relevance in showing discrimination unless they are known to Defendant. *See Jones v. Gerwens*, 874 F.2d 1534, 1542 (11th Cir. 1989) (holding plaintiff had failed to establish a prima facie case of disparate treatment when he could not show that decisionmakers knew about and consciously overlooked prior rule violations by comparators). As a result, Plaintiff cannot rely upon Jones as a comparator in establishing his prima facie case.

Plaintiff next identifies Charles Owens and Adam Lewis as comparators for having improperly used their cell phones without facing punishment. Specifically, Plaintiff claims to have seen Owens and Lewis each using a cell phone at the beginning of a team start-up meeting. Regardless, neither Owens nor Lewis is a proper comparator.

Owens cannot be a proper comparator because his actions did not qualify as the "same basic conduct (or misconduct) as [Plaintiff]." *Lewis*, 918 F.3d at 1227. The Eleventh Circuit has noted that a plaintiff and her comparator need not have engaged in identical conduct, provided that the conduct alleged is materially similar under the circumstances. *See id.* at 1227 n.13 (opining that conduct could be

sufficiently similar where a plaintiff is fired for routinely arriving late to work while a comparator keeps his job despite routinely leaving work early). However, this principle has limits, particularly where there is "some good reason" for treating the conduct of a plaintiff and his comparators differently. *See id.* Here, Plaintiff faced discipline for allegations that he had used his cell phone while working on the Line. In contrast, the only time during which Owens is alleged to have used his cell phone occurred at the beginning of a team start-up meeting, when the Line was not running. Given the safety concerns present during the operation of the Line, there is good reason to treat the cell phone use of Owens differently from that of Plaintiff.

Similarly, Lewis's cell phone use does not make him a proper comparator. Like Owens, he used his cell phone at the beginning of a team start-up meeting, rather than on the Line. Thus, Lewis did not engage in the same basic misconduct as Plaintiff did when he used his cell phone while working on the Line. *See Lewis*, 918 F.3d at 1227 n.13. Furthermore, Lewis did not "share [Plaintiff's] employment or disciplinary history" at the times supervisors witnessed each using his cell phone. *Id.* at 1228. Specifically, Plaintiff had received training regarding Defendant's cell phone policy, and he was aware that, unless one was acting as a Team Leader, use of a cell phone on the Line violated Defendant's policies. In contrast, Lewis had just transferred to B-Shift and therefore was unfamiliar with how those on B-Shift

conducted themselves. Thus, Lewis cannot be a proper comparator in this case.

Likewise, Larry Roland also is not a proper comparator with respect to Plaintiff's unexcused break in the Atrium. To be sure, Roland once left the Line without obtaining permission to do so. However, it is undisputed that Roland's absence arose from an honest mistake that break time had begun. In contrast, Plaintiff knowingly remained away from the Line without permission: he admits that, though he had permission to leave the Line to use the restroom, he did not have permission to remain in the Atrium and examine his notes instead of returning to the Line. Thus, Plaintiff and Roland did not commit the same basic misconduct and are not "similarly situated in all material respects." *Id.* at 1227.

Finally, Logan Wright cannot constitute a proper comparator for Plaintiff's prima facie case, either. Unlike other comparators identified by Plaintiff, Wright was seen engaging in the same misconduct for which Plaintiff received a CPR: he too failed to roll the sill plate as required under Defendant's procedures. However, it is irrelevant whether Wright is similarly situated with Plaintiff: Wright did not receive treatment more favorable than that received by Plaintiff. *See id.* at 1221. Like Plaintiff, Wright received a CPR for his misconduct. To be sure, Wright received only a Level II CPR, as opposed to Plaintiff's Termination CPR, but that discrepancy is consistent with Defendant's progressive disciplinary policy. Plaintiff had three prior

CPRs, so he received a Termination CPR. In contrast, Wright had no prior CPRs, so he received only a Level II CPR. Furthermore, even if Wright receiving only a Level II CPR qualifies as more favorable treatment, he does not "share [Plaintiff's] employment or disciplinary history" and is therefore not similarly situated in all material respects. *Id.* at 1228. Accordingly, Wright is not a proper comparator, and Plaintiff has failed to establish a prima facie case of race discrimination.

Having failed to establish a prima facie case of race discrimination, Plaintiff can escape summary judgment only if he has otherwise presented "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Smith*, 644 F.3d at 1328 (quoting *Silverman v. Bd. of Educ. of Chicago*, 637 F.3d 729, 734 (7th Cir. 2011)). "A 'convincing mosaic' may be shown by evidence that demonstrates, among other things, (1) 'suspicious timing, ambiguous statements . . ., and other bits and pieces from which an inference of discriminatory intent might be drawn,' (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1185 (11th Cir. 2019) (quoting *Silverman*, 637 F.3d at 733–34). Regardless of what type of evidence Plaintiff presents, it must be sufficient to "raise[] a reasonable inference that the employer discriminated against" him. *Smith*, 644 F.3d at 1328.

Plaintiff's response identifies several pieces of circumstantial evidence that he argues could establish intentional discrimination by his superiors. First, Plaintiff notes that, as discussed above, Defendant failed to discipline white employees, such as Charles Owens and Adam Lewis, for improper cell phone use in violation of Defendant's policies. Second, when he brought this disparate treatment to the attention of David Foreman, Foreman took no action and instead instructed Plaintiff to worry about himself. Finally, Plaintiff again cites the EEOC's "Letter of Determination" which found a reasonable basis for Plaintiff's claims that he faced discrimination. (Pl's Ex. 2.)

Upon review of the record, the Court finds that the evidence presented by Plaintiff is insufficient to allow for a reasonable inference that Defendant discriminated against Plaintiff based on his race. Plaintiff argues that Defendant's failure to discipline white employees for their cell phone use, regardless of justification, "is counter intuitive to its progressive, purportedly, uniform discipline structure that the Defendant stands behind." (Doc. 17.) However, the record indicates only that Defendant's progressive disciplinary policy governs what level of discipline should be issued, not *when* discipline is appropriate in the first place. (*See* Def's Ex. C at ¶¶ 4–5.) Neither party has pointed to any evidence indicating that Defendant's progressive disciplinary policy allows no discretion in determining

whether a Team Member's rule violation warrants discipline. Thus, the fact that Defendant did not discipline each violation by white employees does not, without more, indicate that its justification for disciplining Plaintiff was merely a pretext for racial discrimination. Nor does Foreman's statement to Plaintiff instructing him to worry about himself when Plaintiff raised concerns about disparate treatment; Plaintiff has offered no evidence showing that Foreman had any obligation to investigate Plaintiff's claims further. Finally, for the same reasons that the EEOC's findings carry little probative weight in resolving Plaintiff's retaliation claim, the Court does not rely upon those findings in resolving Plaintiff's race discrimination claim.

Plaintiff has thus failed to present evidence that creates a genuine dispute on the question of race discrimination. Accordingly, summary judgment is due to be granted for Defendant as to this claim.

## IV.   CONCLUSION

For the reasons stated above, Defendant's motion (doc. 12) is due to be granted. An order consistent with this opinion will be entered contemporaneously herewith.

**DONE** and **ORDERED** on June 10, 2020.

L. Scott Coogler
United States District Judge

199455